UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MICHAEL S. WARD,<br>    *Plaintiff*,<br>v.<br>TOWN OF NEW MILFORD,<br>    *Defendant.* | Civil No. 3:16cv627 (JBA)<br><br>March 29, 2018 |

**RULING GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Michael S. Ward filed his single-count complaint on April 21, 2016, alleging Defendant Town of New Milford discriminated against him on the basis of a perceived disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 1212. Defendant now moves [Doc. # 35] for Summary Judgment. Oral argument was held on February 9, 2018. For the following reasons, Defendant's Motion is granted.

**I. Background**

Plaintiff was hired by Defendant as a probationary police officer in the New Milford Police Department ("NMPD") on April 4, 2014. (Def.'s Loc. R 56(a)1 Stmt [Doc. # 34-1] ¶ 1; Pl.'s Loc. R 56(a)2 Stmt [Doc. # 42-3] ¶ 1.)[1] He successfully completed basic training at the Connecticut Police Academy and, on September 20, 2014, entered the NMPD Field Training Officer (FTO) Program, which is overseen by NMPD Sergeant Dzamko. (*Id.* at 24-26; *see also* Ex. D (Boyne Depo.) to Def.'s Mot. for Summ. J. [Doc. # 35-5] at 21-22.) After each field training shift, the FTO[2] prepares a Daily

---

[1] Plaintiff's local rule statement admitted most of Defendant's undisputed facts. Therefore, the Court refers to both Plaintiff and Defendants' local rule statements together as "Loc. R. 56 Stmt," and only specifies one or the other where the fact is not admitted.

[2] This term is used to refer both to the training program, i.e., the FTO program or training, and the Officers (FTOs) who trained the probationary officers.

Observation Report ("DOR") to document the strengths and weaknesses demonstrated by the field trainee; the two of them then review and sign the DOR. (*See* Ex. C (Dzamko Depo.) to Def.'s Mot. for Summ. J. [Doc. # 35-4] at 53-55; Ex. H (DORs) to *id.* [Doc. # 35-11].)

Between September 20 and October 25, 2014, Plaintiff successfully completed Phase 1 (75% training/25% evaluation) of the Program. (LR 56 ¶ 4.) Between October 28 and November 28, 2014, he completed Phase 2 (50% training/50% evaluation) of the program, despite experiencing some performance issues. (LR 56 ¶ 5; Ex. J to Def.'s Mot. for Summ. J. [Doc. # 34-3] and Ex. 5 (Dr. Stern Report) to Pl.'s Opp'n [Doc. # 42-8] at 3.)[3]

Plaintiff was then advanced to Phase 3 of the field training, which he began on November 30, 2014 with assigned Field Training Officer ("FTO") Taranto. (LR 56 ¶ 6.) Phase 3 consists of 25% training and 75% evaluation, and Plaintiff was expected to complete it on December 27, 2014. (Ex. N (Letter to Boyne) to Def.'s Mot. for Summ. J. [Doc. # 34-5] at 5.) During this Phase, Plaintiff felt very fatigued and experienced issues with remembering basic tasks and skills that he had been able to perform earlier in his field training. (*Id.* at 26-27.) The DORs prepared by Officer Taranto in December of 2014 show that Plaintiff could not and/or would not perform basic tasks, locate and drive to landmark locations within Town, and complete reports in a timely manner. (LR 56 ¶ 7.)

Officer Taranto also discovered that Plaintiff had called in "sick" on December 12, 2014 to prepare for a military obligation. (*See* Ex. N to Def.'s Mot. for Summ. J. at 5-6.) When he

---

[3] Sergeant Dzamko was in contact with all the Field Training Officers assigned to Plaintiff, and reviewed Plaintiff's DORs. (Ex. 2 to Pl.'s Opp'n [Doc. # 42-5] and Ex. E to Def.'s Mot. for Summ. J. [Doc. # 35-7] (Dzamko Depo.) at 11:23-12:9.) Dzamko had no issues with Plaintiff's job performance during Phases 1 and 2. (*Id.* at 15.)

2

confronted Plaintiff about this departmental violation, Plaintiff "broke down." (*Id.*; *see also* Dzamko Depo at 34:5-9.) Subsequently, on December 19, Sergeant Dzamko met with Deputy Chief Buckley to discuss Plaintiff, and Dzamko advised Buckley he was going to "un-plug"[4] Plaintiff from the FTO Program and re-assess how to train and evaluate him. (Ex. N to Def.'s Mot. for Summ. J. at 6; Dzamko Depo. at 51-60.)

While still on "unplugged" status, Plaintiff woke up with a sore throat, called out sick on January 5 and 6, 2015 (LR 56 ¶ 9), and went to his primary care physician, who diagnosed him with mononucleosis ("mono") (Ex. A to Def.'s Mot. for Summ. J. [Doc. # 35-2]; Ex. 1 (Pl.'s Depo.) to Pl.'s Opp'n [Doc. # 42-4] at 27:12-17; Ex. K (Mono Diagnosis) to Def.'s Mot. for Summ. J. [Doc. # 34-4].)[5]

On January 6, Deputy Chief Buckley was informed by Officer Taranto of a note that had recently been written by Plaintiff,[6] stating:

> I feel that when I first started it was too much too fast. Instead of doing a little here a little there it was as if I was expected to already know what I was supposed to do. I do not think that I was able to take in as much information as I would have liked to in the beginning. As a result at this point in time I feel very over whelmed [sic]. Being so overwhelmed has caused me to not be able to retain information along the

---

[4] Unplugging refers to an opportunity for the probationary officer to return from a leave of absence with a lessened workload so he can "ease back into the training program." (Dzamko Depo. at 16:20-17:5.) It differs from administrative leave because the officer would still be coming to work, but instead of actively training simply observes another officer. (*Id.* at 51:14-23.)

[5] The test was run on January 5, 2015 and its results reported to Plaintiff on January 6 (as evidenced by the report from the primary care physician) but the letter from the physician notifying Defendant of the diagnosis is dated January 15. (Ex. K to Def.'s Mot. for Summ. J.) Plaintiff cannot recall when he first informed any member of the NMPD or representative of the Town. (LR 56 ¶ 11.)

[6] It was later determined that the note was written some time in December, likely December 17. (Ex. E to Def.'s Mot. for Summ. J. at 45:6-8; *see also* Ex. N to *id.* at 8.)

3

way. I want to be here and I want to learn. I am trying the best I can to keep up the pace with everything. If I do not succeed at this job I do not know what else I would do. This is everything I have ever dreamed of doing. I do accept that I have made wrong choices in the past in regards to a lot of things whether it be time management, sick days, personal life. I apologize for all of this and I hope that I can overcome all of this and be better at working here.

(LR 56 ¶ 12; Ex. I (Pl.'s Note) to Def.'s Mot. for Summ. J. [Doc. # 34-2].) The note was found by Officer Taranto in Plaintiff's notebook, which he had retrieved from Plaintiff's mail slot to reference while he filled out FTO paperwork. (*See* Ex. N to Def.'s Mot. for Summ. J. at 8; Ex E to *id.* at 39:5-11.)[7]

On January 7, the note was brought to the attention of Chief Boyne, who met with Deputy Chief Buckley and the Town's personnel director to discuss their plan for Plaintiff. (LR 56 ¶ 13.) Chief Boyne testified that he was concerned about "self-harm" after reading Plaintiff's note. (Boyne Depo. at 145:3-6.) It was decided that Plaintiff, who had been out of work since January 4, would be placed on paid administrative leave so professionals could confirm his physical and psychological fitness for duty. (LR 56 ¶ 13.) Plaintiff was notified of this in writing that day. (*Id.* ¶ 14.) Defendant put Plaintiff on administrative leave because of the note and because "[w]e were coming to find out that there were some performance issues that he wasn't doing very well in." (Buckley Depo. at 47:18-21.) Defendant wanted to make sure Plaintiff was "okay psychologically." (*Id.* at 47:22-23.)

On January 13, 2015, while out on leave of absence, Plaintiff was evaluated by Michael L. Stern, PhD, to whom he was referred by the Town. (LR 56 ¶ 15; Pl.'s Depo. at 47-52; *see also* Dr.

---

[7] Plaintiff testified that he wrote the note at Officer Taranto's request and that he and Officer Taranto had previously gone over the note together. (Pl.'s Depo. at 40:1-14.) Plaintiff does not dispute that Defendant was authorized to look in his notebook.

Stern Report.) During the evaluation, Plaintiff acknowledged "experiencing some performance issues during his Phase 2 training," and that he had "difficulty retaining information, maintaining concentration, and maintaining focus." (*See* Dr. Stern Report at 3.) Plaintiff "attributed his fatigue and performance difficulties to the undiagnosed occurrence of mono." (*Id.*) Plaintiff also said the "wrong choices" referenced in his note included "his poorly conceived decision to call out sick to have additional time to prepare for his National Guard exercises." (*Id.*)

By the time of Dr. Stern's evaluation, Plaintiff had returned to full physical health, and reported that he "no longer experiences the fatigue, memory problems and concentration problems" that plagued him before he was placed on leave. (*Id.* at 4; *see also* Pl.'s Depo. at 48:7-12.) Dr. Stern's report concluded: "[a]t this time there are no significant concerns presented in terms of [Plaintiff's] psychological functioning that would preclude his being considered qualified for return to duty." (Dr. Stern Report at 4.) Documentation confirming Plaintiff's physical and psychological fitness for duty was received by the department, and he was authorized to return to work on January 23, 2015. (*See* Ex. P (Email from Personnel Dep't) to *id.* [Doc. # 35-17].)

On January 23, 2015, when Plaintiff returned to work, according to Defendant, he remained "unplugged" and observed several shifts before beginning Phase 3 training anew with newly assigned FTO Officer Masi. (Def.'s Loc. R. 56 Stmt. ¶ 19.) Plaintiff denies being unplugged. (Pl.'s Loc. R. 56 Stmt. ¶ 19.)

Sergeant Dzamko testified that when Plaintiff returned from administrative leave, "part of the unplugged process" included Plaintiff just riding with the officer for a "few days or maybe a week" and "then slowly going back into the FTO-phased program of gradually taking on a greater

workload." (Dzamko Depo. at 44:6-13.)[8] Dzamko stated: "We brought him back prior to FTO, even before Phase 1, just riding with the veteran trainers so that he could have an opportunity to see how a veteran officer handles the calls. And . . . it was explained [that] we were going to ease him back into" the training. (Dzamko Depo. at 47:4-16.) Additionally, the first four DORs after Plaintiff returned to work all leave blank the section in which the "Phase" is indicated (*see* DORs at 1110-16), and Dzamko testified that if a trainee is unplugged and not actively training in any Phase, these areas "could be [left] blank" (Dzamko Depo. at 57:5-8).

On the other hand, Plaintiff points to FTO Masi's testimony that when Plaintiff came back, Masi "was [directed] to continue his Phase 3" training. (Ex. 3 to Pl.'s Opp'n [Doc. # 42-6] and Ex. F (Masi Depo.) to Def.'s Mot. for Summ. J. [Doc. # 35-9] at 33:3-4.) Masi stated that he would have begun the training with Plaintiff as "the primary officer riding in the passenger seat [and] . . . tak[ing] whatever work came their way." (*Id.* at 29:2-5.)[9]

At no time while he observed or later field trained with FTO Masi, did Plaintiff experience or complain of any symptoms of ill-health. (LR 56 ¶ 20.) Masi testified that he had not been told about Plaintiff's mono diagnosis or psych evaluation and that he had no knowledge that Plaintiff had already been in Phase 3 prior to taking administrative leave. (Masi Depo. at 15:2-16:1, 19:4-22,

---

[8] Plaintiff testified that he was told by Sergeant Dzamko that when a probationary police officer that is in field training misses two (2) weeks or more, the officer essentially restarts the field training from Phase 1 at an accelerated rate. (Pl's Depo. at 121:3-21.) Sergeant Dzamko testified only that Plaintiff "specifically had to re-go through Phase 3 because he [had not] successfully complete[d]" it. (Dzamko Depo. at 47:2-4.)

[9] Masi is never asked directly in the excerpts provided by either party whether he remembered Plaintiff being "unplugged" for the first several shifts after he returned from his absence.

21:23-22:10; 34:22-35:7.)¹⁰ Although he was deemed physically and psychologically fit for duty by a qualified professional, Plaintiff's performance remained below the minimum standards expected in Phase 3. (*See* Dzamko Depo. at 63:2-65:17.) Plaintiff's myriad performance deficiencies are catalogued throughout the DORs prepared by Officer Masi,¹¹ and Masi ultimately chose not to recommend that Plaintiff proceed to Phase 4. (LR 56 ¶ 21; *See* DORs at 1155.)

On February 21, 2015, FTO Masi prepared an "End of Phase Evaluation Summary" regarding his training of Plaintiff in Phase 3. The evaluation provides in part:

> PPO Ward has demonstrated poor officer safety tactics on numerous occasions and it is the opinion of this FTO that [Ward] has failed to retain FTO input as to this shortcoming. [He] has also shown a consistent inability to perform under even moderate stress, and becomes flustered easily, and as a result, cannot multi-task…has shown an inability to retain pertinent information, e.g., tactics, commonly-used statutes and PD policies and procedure. Consistently marked insufficient in pro-active patrol; does not see or chooses not to address violations.

(DORs at 1155.) Officer Masi concluded that, "[b]ased solely on observed performance . . . PO Ward is at this time unable to function as a fully-trained, solo police officer, and it is not recommended that he move to the next phase of his FTO training." (*Id.*) At his deposition, Officer

---

¹⁰ Plaintiff disputes that Masi was unaware of his mono diagnosis and psych evaluation, but points only to one isolated portion of Masi's testimony in which he said he could not recall if he had been informed of Plaintiff's "undisclosed issues." (Pl.'s LR 56 ¶ 20.) Read in its entirety, it is clear that Masi testified he only knew that Plaintiff had been on hiatus and out of the building before he began training with him and was not aware of the mono or that Plaintiff had been to see a psychiatrist.

¹¹ Examples include: "Unable to recall statute for unsafe movement from stop. [Officer Ward] was evaluated negatively on 2/11/15 for not knowing same statute" (DORs at 1150); "Does not see/ignores violations. Makes excuses as to why he either did not see violation or justifies not taking enforcement action" (*id.* at 1152); "Three or more times the amount of time a nonprobationary officer would take to complete a similar report. Significantly longer time to complete report than a probationary officer should take" (*id.* at 1154).

7

Masi explained that a "recruit is recommended for advancement or a recruit is recommended for remedial extension, I chose remedial extension. . . . That means that I don't believe he should be passed on to the next phase." (Masi Depo. at 38:13-20.)

On February 22, 2015, Plaintiff was re-assigned to FTO Officer Kenney, who had more than twenty years of law enforcement experience, the most of any FTO in the NMPD at that time. (LR 56 ¶ 22.) Chief Boyne explained that he wanted "a new set of eyes" or "another opinion" to make sure it was not an issue of differences in personality. (Boyne Depo. at 116:14-19.) However, Officer Kenney also did not recommend that Plaintiff advance to Phase 4 of the program. (LR 56 ¶ 24.)[12]

After his shift on February 23, 2015, Plaintiff was summoned to meet with NMPD Chief Boyne and Sergeant Dzamko. (LR 56 ¶ 25.) Plaintiff testified that at that meeting Chief Boyne told him he was not "malicious enough" for the job and that he was taking longer than normal for the average probationary officer to complete field training.[13] (Pl.'s Depo. at 92:8-17.) Buckley and the Chief decided that Plaintiff "was unable to perform the essential functions of a police officer and he was a danger to public safety." (Buckley Depo. at 77:20-23.) Although Plaintiff's probationary employment could be terminated without recourse based on poor performance, Chief Boyne gave

---

[12] Officer Kenney only trained Plaintiff for two full days. His DORs include the following observations: "[N]o actions were taken to control the subject's movements or detain/secure his person. This FTO stepped in and took control of the situation for officer safety reasons . . ." (DORs at 1157); "it was like he never investigated a collision before. I asked Officer Ward if we (the FTOs) were deficient in providing him training and he responded that we were not" (*id.* at 1161).

[13] Based on the excerpts provided in the Summary Judgment record, the Court cannot determine whether Chief Boyne admitted to making this statement. Defendant maintains that in Boyne's deposition he denies having said this, but the page number it provides does not exist in the Court's record.

him the option to resign instead. (Pl.'s Depo. at 90:6-8; Ex. D at 155-156.) Plaintiff wrote a letter of resignation on February 25, 2015, and handed it to Chief Boyne at the NMPD on February 27, 2015. (LR 56 ¶ 31.)[14]

II.     Discussion[15]

"Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*[.]" *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009) (citations omitted). "A plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered

---

[14] Plaintiff claims his performance was negatively affected by deficient training. He points to testimony from Deputy Chief Buckley, who reviewed the Phase 1 and Phase 2 documents and stated that he "wasn't very pleased with the training [Plaintiff] received." (Buckley Depo. at 48:8-11.) However, according to Sergeant Dzamko, Plaintiff received the same training that every other recruit received from Defendant. (Dzamko Depo. at 40:23-24.) Moreover, as noted above, Plaintiff apparently told Officer Kenney his training had not been deficient. (DORs at 1161.)

[15] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

reason is a pretext." *Id.* (internal quotation marks and citation omitted). The separate stages of a plaintiff's demonstration of a prima facie inference of discrimination and pretext "tend to collapse as a practical matter under the *McDonnell Douglas* framework." *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 n. 1 (2d Cir. 2002).

### A. Plaintiff's Prima Facie Case

"To establish a prima facie case under the ADA, a plaintiff must show by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006); *see also Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001) (applying same prima facie test in regarded-as disabled discrimination claim).

In a "regarded as" or perceived disability discrimination claim, a plaintiff "need only demonstrate that the employer regarded [her] as impaired, whether or not that impairment is believed to limit a major life activity." *Palmieri v. City of Hartford*, 947 F. Supp. 2d 187, 200 (D. Conn. 2013) (citing *Hilton v. Wright*, 673 F.3d 120, 129 (2d Cir. 2012)). Plaintiff's burden of setting out a prima facie discrimination case is "minimal." *See, e.g., McPherson v. New York City Dept. of Education*, 457 F.3d 211, 215 (2d Cir. 2006); *see also Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001) ("burden at the prima facie stage often is described as *de minimis*").

Defendant does not dispute that it is subject to the ADA, but maintains that Defendant did not regard Plaintiff as impaired, Plaintiff was not qualified to perform the essential functions of

the job, and Plaintiff did not suffer any adverse employment action *because* of his perceived disability.[16]

The ADA provides, in relevant part that no employer "shall discriminate against a qualified individual on the basis of disability in regard to . . . [the] discharge of employees[.]" 42 U.S.C. § 12112(a). The Act defines "disability" to mean "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Plaintiff here claims not that he had a disability as defined under 42 U.S.C. § 12102(1)(A) or (B) but claims that he was "regarded as having such an impairment." *Id.* The Act further provides that "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). Finally, an individual does not meet this requirement where the impairment is "transitory and minor[,]" which is defined as being "an actual or expected duration of 6 months or less." The ADA makes clear that employers are not required to provide a reasonable accommodation to an individual who is only covered under the Act as "being regarded as having such an impairment[.]" *See* 42 U.S.C. § 12201(h).

Plaintiff contends that Defendant perceived that he suffered from a mental disorder despite the contrary finding in Dr. Stern's psychological evaluation and report that he "did [not] have a

---

[16] Defendant concedes prong one; prong three is arguably satisfied by Plaintiff's graduation from the Police Academy; and prongs two and four are interrelated because each depends on proof that Defendant perceived Plaintiff as being disabled.

11

psychological disorder" and "was psychologically fit to be a police officer." (Pl.'s Opp'n at 12.)[17] Defendant responds that there is no evidence in the record showing that it actually regarded Plaintiff as having an impairment.

The evidence establishes that Chief Boyne met with Deputy Chief Buckley and the Town's personnel director on January 7, just after the discovery of Plaintiff's note, at which point they formalized their decision to place Plaintiff on paid administrative leave and have him submit to a fitness-for-duty exam. (*See* Def.'s Ex. N at 9; Boyne Depo. at 80:2-81:19; Buckley Depo. at 45:11-47:23.) This decision was made because Defendant was concerned about Plaintiff's psychological wellbeing and safety. (LR 56 ¶ 13.)

Defendant argues that once it received Dr. Stern's report notifying it that "there are no significant concerns presented in terms of [Plaintiff's] psychological functioning that would preclude his being considered qualified for return to duty" (Dr. Stern Report at 4), there is no support for a claim that it perceived Plaintiff as disabled. Despite his acknowledged concern for Plaintiff's mental health after finding the note, Chief Boyne testified that at no point in time did he perceive Plaintiff as being mentally disabled. (*Id.* at 148:8-11.) Plaintiff offers no evidence that any of the NMPD officers who were conducting or supervising his training viewed him as having a mental disability. Sergeant Dzamko testified that when he found out Plaintiff had a psychiatric evaluation, he did not think Plaintiff had a disability (Dzamko Depo. at 49:9-14) and Deputy Chief Buckley also denied that he thought Plaintiff had any sort of mental disability (Buckley Depo. at

---

[17] Plaintiff testified that he believed "Boyne's decision to terminate [his] employment was because he regarded [Plaintiff] as being disabled, suffering from a mental disorder." (Pl.'s Depo. at 10-12.) When asked what mental disorder he was referring to, Plaintiff responded "essentially just that I was regarded as disabled mentally." (*Id.* at 12-22.)

60:19-24). Both Officers Masi and Kenney testified they had no knowledge that Plaintiff had been to see a psychiatrist at all. (*See* Masi Depo. at 15:2-16:1, 19:4-22, 22:7-10; 34:22-35:7; Kenney Depo. at 12:21-18; 24:2-15.)

Nonetheless, Plaintiff argues that an inference can be drawn that Defendant perceived him to be disabled based on evidence showing that he was not given a fair chance to succeed upon returning from administrative leave. He maintains that Defendant "ha[d] already written [P]laintiff off" and "concluded that [P]laintiff was not fit to be police officer based on [P]laintiff's handwritten note," which was discovered on January 6, 2015, before his forced resignation February 25, 2015. (Pl.'s Opp'n at 13.) Plaintiff views the record as showing that when he returned from his leave he was not unplugged and eased into training, but instead was immediately thrown back into Phase 3 training. (*Id.*) Relatedly, he claims that although Defendant has the ability to extend a probationary officer's training, it did not do so for Plaintiff, and that he should have been restarted from Phase 1 of the program to address inadequate training he had received and the fact that he had been sick with mono. (*Id.* at 12-14.)

With respect to the unplugging, Sergeant Dzamko testified that Plaintiff was unplugged, and the first four DORs did not indicate any Phase number, which he confirmed could indicate the officer was unplugged on those days. On the other hand, Officer Masi testified that he was simply instructed to continue Plaintiff's training from Phase 3, without indication that Plaintiff should be eased into this training. While there is factual dispute as to whether Plaintiff was unplugged, its significance is minimal, absent any evidence in the record that it was Defendant's standard procedure to unplug an officer in training when he or she returns from a leave of absence, or any examples of circumstances in which this policy was applied.

13

Plaintiff's claim that his training was not extended is also a source of dispute. The record shows that Plaintiff was initially scheduled to begin November 30, 2014 and conclude December 27, 2014, but he was "unplugged" from field training by Sergeant Dzamko on December 19—and remained unplugged when he called out sick on January 5, and 6, 2015. (*See* Ex. N to Def.'s Mot. for Summ. J. at 5-6; LR 56 ¶ 9.) He was then placed on administrative leave after the discovery of the note (LR 56 ¶ 14) and did not return to work until January 23, 2015 after being deemed fit for duty by the psychologist. (*See* Ex. H at 1110; Pl.'s Depo. at 74:15-22). At that point he restarted Phase 3 training (whether initially "unplugged" or not), which he received initially from Officer Masi and then Officer Kenney, until February 24, 2015.

When measuring from the first (undisputed) unplugged period before discovery of the note and the time Plaintiff was out on administrative leave, Defendant did technically extend Plaintiff's training. However, comparing his actual training times in Phase 1—from September 20 to October 25, and in Phase 2—from October 28 to November 28, to his training time after he returned from leave on January 23, Plaintiff was expected to complete Phase 3 in less than a full month, by February 21, 2015, which is less than he was given for each of the first two Phases.[18] (*Id.*) Two days after the expected completion date, Plaintiff was summoned to meet with Chief Boyne and Sergeant Dzamko and informed that his performance had been far below acceptable standards and that the department could not afford to spend any more time and resources on his candidacy. This dispute as to whether Defendant actually extended Plaintiff's training in any meaningful way after

---

[18] Plaintiff had already participated in Phase 3 from November 30, 2104 until he was first unplugged before discovery of the note on December 19, he was suffering from mono for at least a portion of that training, but, as described above, he was required to re-do his Phase 3 training.

he returned from leave to verify his psychological fitness depends on how the time is counted, and Plaintiff proffers no evidence about how the dates were set.

Finally, Plaintiff maintains that in his case Defendant did not follow its policy that if a probationary police officer in field training misses two weeks or more, the officer essentially restarts the field training from Phase 1 at an accelerated rate. (Pl's Depo. at 121:3-21.)[19] He also points to the testimony of Deputy Chief Buckley, who reviewed Plaintiff's Phase 1 and Phase 2 documents and stated that he "wasn't very pleased with the training [Plaintiff] received." (Buckley Depo. at 48:8-11.) Thus, Plaintiff argues, the evidence that Defendant recognized that Plaintiff's performance could have been affected by poor training but did not begin his training back at Phase 1, supports an inference that Defendant believed Plaintiff was not mentally fit.

In summary, Plaintiff theorizes that Defendant gave up on him, believing him to be mentally disabled after finding his note, as demonstrated by the fact that Defendant did not allow Plaintiff to start from Phase 1, placed him directly back into Phase 3 training without any "unplugging," and gave him less than one month to complete Phase 3.

However, Plaintiff's theory that this evidence demonstrates that Defendant harbored lingering doubts as to his mental fitness after receiving Dr. Stern's evaluation is completely undermined by the fact that Plaintiff admits that "Chief Boyne knew Plaintiff did not suffer from a mental disorder or disability at the time he resigned." (LR 56 ¶ 16.) Simply put, Chief Boyne could not both know Plaintiff did not have any mental disability, while simultaneously perceiving him as suffering from a disability cognizable under the ADA, and there is no evidence that the

---

[19] Again, Plaintiff proffers no other evidence outside of his own testimony that this was Defendant's policy.

other of the Officers involved with Plaintiff's training treated him differently after learning of his note or that he had seen a psychologist. Since Chief Boyne knew Plaintiff did not suffer from any mental disorder or disability when he asked Plaintiff to resign, and there is no evidence in the record of discriminatory conduct by any other of the involved Officers, it is far-fetched to conclude that Defendant retained any perception of Plaintiff as disabled, or that such a perception could be causally linked to his discharge, precluding Plaintiff from satisfying prima facie prongs two and four.

Nevertheless, because, as discussed above, the steps of the *McDonnell Douglas* analysis can "tend to collapse as a practical matter," *Collins v. New York City Transit Auth.*, 305 F.3d 113, 119 n. 1 (2d Cir. 2002), the Court will address the question of whether reasonable jurors could find Defendant's proffered justification to be pretextual.

### B. Defendant's Proffered Reason for Termination

Defendant must articulate a "legitimate, non-discriminatory reason" for forcing Plaintiff to resign from the FTO program. *See McBride*, 583 F.3d at 96.

Defendant asserts that it terminated Plaintiff because Plaintiff's performance was consistently deficient without signs of improvement. (Def.'s Mot. for Summ. J. at 29.) When Plaintiff returned from leave in January to restart Phase 3 he was physically and mentally healthy. (*Id.* at 117:8-11.) Sergeant Dzamko testified that based on Plaintiff's DORs following his return to the program, as of February 23 his performance was not up to the standard of a Phase 3 trainee, (Dzamko Depo. at 62:18-65:17), notwithstanding having already spent nearly three weeks in Phase 3 prior to his administrative leave.

On February 21, after training Plaintiff for nearly a month, Officer Masi recommended in the "End of Phase [3] Evaluation Summary" that Plaintiff not be moved into Phase 4 of the training.

(DORs at 1155.) Chief Boyne then assigned Plaintiff to FTO Kenney, who after two days of training Plaintiff, similarly did not recommend advancing Plaintiff to Phase 4. Indeed, Officer Kenney remarked that "it was like [Plaintiff] never investigated a collision before" (DORs at 1157), which Chief Boyne testified "should be routine . . . in the first few days" of training (Boyne Depo. at 147:6-19). Both Officers Masi and Kenney testified they had not been aware Plaintiff had been to see a psychologist and Plaintiff puts forward no contrary evidence that either Officer thought he was mentally disabled. (*See* Masi Depo. at 15:2-16:1, 19:4-22, 22:7-10; 34:22-35:7; Kenney Depo. at 12:21-18; 24:2-15.)

Plaintiff's testimony that Chief Boyne invited him to resign in lieu of dismissal because he did not want to waste more money on Plaintiff's field training is consistent with Defendant's conclusion that Plaintiff continued to perform below the required level to complete the FTO training.[20] (Pl.'s Depo. at 92:8-10; *id* at 98:15-17.) Chief Boyne testified that once he received Dr. Stern's report indicating there were no psychological concerns and that Plaintiff was fit for duty, "there really wasn't a definitive answer other than skill why he couldn't achieve these training goals." (Boyne Depo. at 145:14-17.)[21]

Based on this record, Defendant has offered sufficient evidence on which a reasonable jury could find Plaintiff was forced to resign for a legitimate business reason—i.e., that Plaintiff's

---

[20] Even if proved, the fact that Chief Boyne also told Plaintiff he was not "malicious enough" to be a police officer, is not inconsistent with Defendant's proffered reason.

[21] He further testified: "I don't know what else [we] could have done. . . . We reintroduced him to Phase 3 training. The training officers revisited training opportunities. There's no reason why he shouldn't succeed. The training is not going to change. It was there before he was sick and it came back when he was healthy. I don't know what else -- what are the options?" (*Id.* at 154:2-12.)

17

performance was inadequate, indicating the likelihood he would not be a successful solo patrol officer.

### C. Plaintiff Makes no Showing of Pretext

To demonstrate pretext, a plaintiff must offer evidence "that the [defendant's proffered] reason was false and that discrimination was the real reason." *Sanchez v. Connecticut Natural Gas Co.*, 421 Fed. Appx. 33 (2d Cir. 2011). Pretext can be shown by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *DeAngelo v. Yellowbook Inc.*, 105 F. Supp. 3d 166, 177–78 (D. Conn. 2015) (citation and quotation marks omitted). "[A] plaintiff must show both that the reason was false, and that the discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *see also Leibowitz v. Cornell Univ.*, 584 F.3d 487, 504 (2d Cir. 2009) ("[P]laintiff carries the ultimate burden of persuasion and must produce evidence such that a rational finder of fact could conclude that the adverse action taken against her was more likely than not a product of discriminatory animus."). However, in certain circumstances, "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 134 (2000).

Plaintiff maintains that Defendant's proffered reason is pretext for disability discrimination, based on the temporal proximity between the discovery of his note and his termination, and on the fact that Defendant failed to follow its own policies—i.e. that it did not unplug him when he returned, did not allow him to start from Phase 1 when he returned from leave, and did not extend his training.

Plaintiff offers no evidence of comparative situations in which Defendant unplugged probationary officers, started them back at Phase 1, or extended their training, upon return from leave, and Plaintiff's testimony that these were in fact Defendant's policies, without more, lacks much probative force. Moreover, even if proved, Defendant's actions do not show that its reason for the adverse action—Plaintiff's subpar performance—was pretext for discrimination in the face of undisputed evidence that Plaintiff did perform below standards during the relevant time period, particularly where Plaintiff does not claim that the negative reports in the DORs or subsequent evaluations by two separate Officers evidenced any perception that Plaintiff was mentally disabled.

Taken as a whole, the evidence shows that Plaintiff was placed on leave due to legitimate concerns about his well-being, derived from his absences and written expressions of being overwhelmed and in despair. (*See* Letter to Boyd at 8-9.) While Plaintiff's problematic performance in Phase 3 prior to his taking leave can be explained by the mono diagnosis, when he returned, healthy, his performance continued to be below standards, as evidenced by the DORs and testimony of his FTOs. (*See* DORs at 1110-1163; Boyne Depo. at 145:14-17; *id.* at 154:2-12.)

On this record, Plaintiff has not met his burden of demonstrating that reasonable jurors could conclude that the reports and records of his poor performance were untrue or were tainted by any perception of disability. Thus, even if Plaintiff were deemed to have established his prima facie case, there is simply insufficient evidence for any rational jury to find that Plaintiff's forced resignation was pretextual or that his discharge was the product of discriminatory animus. *See Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1117–18 (2d Cir. 1988) (Affirming grant of summary judgment where the "plaintiff fails to raise a genuine issue of fact as to whether the defendant's articulated reason was unworthy of credence[,]" and "he provides scant evidence which might establish a discriminatory motive.").

III.  **Conclusion**

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED. The Clerk is directed to close the case.

IT IS SO ORDERED.

　　　　　　　　　　/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 29th day of March 2018.